### DAGGETT v. AVIS HARDWARE CO.
### (No. 8298.)

(Court of Civil Appeals of Texas. Ft. Worth. Jan. 8, 1916. Rehearing Denied Feb. 5, 1916.)

1. APPEAL AND ERROR ⟐843 — REVIEW — HARMLESS ERROR — SUFFICIENCY OF EVIDENCE.

Where judgment was rendered against one defendant on the two theories of liability of agency and of partnership, the question on appeal, whether the evidence sustained the finding as to partnership, was immaterial where it did sustain the finding as to agency.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3331–3341; Dec. Dig. ⟐843.]

2. PRINCIPAL AND AGENT ⟐123—LIABILITY OF PRINCIPAL—SCOPE OF AUTHORITY.

Evidence, in an action for supplies furnished, *held* to show that they were furnished on the defendant's credit at the instance of his agent who acted within the scope of his authority.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 420–429; Dec. Dig. ⟐123.]

3. EVIDENCE ⟐265—ADMISSIONS—ENTRY IN BOOKS—CONCLUSIVENESS.

The mere fact that the plaintiff in selling goods entered on the books an account as against a partnership did not change the liability of the defendant to whom in fact credit was alone extended, that being a mere circumstance explainable and not conclusive as against the plaintiff.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1029–1050; Dec. Dig. ⟐265.]

4. PRINCIPAL AND AGENT ⟐150—LIABILITY OF PRINCIPAL—SCOPE OF AUTHORITY.

A principal, whose agent secured credit for him when he was authorized only to draw upon the principal, could not complain or avoid liability for the credit extended, although the agent actually exceeded the authority given in order to further the principal's business.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 556–563; Dec. Dig. ⟐150.]

Appeal from Wichita County Court; Harvey Harris, Judge.

Action by the Avis Hardware Company, a partnership, against J. P. Daggett and another. Judgment for plaintiff on answers of the jury to special interrogatories, and defendant Daggett appeals. Affirmed.

Carrigan, Montgomery & Brittain, of Wichita Falls, for appellant. W. F. Weeks and Harry C. Weeks, both of Wichita Falls, for appellee.

CONNER, C. J. The Avis Hardware Company, a partnership composed of J. D. Avis and F. P. Avis, instituted this suit against J. P. Daggett and the Wichita River Oil Company, a partnership alleged to be composed of the said Daggett, E. T. Stevens, C. M. Coats, and others. It was alleged that between August and October, 1914, the partnership mentioned, through E. T. Stevens and C. M. Coats, had purchased from the plaintiff certain goods, wares, and merchandise, as shown by an itemized account attached to the petition as an exhibit; that there remained due and unpaid upon said account a balance of $403.86, for which recovery was sought. By a second count the plaintiff alleged that, if they were mistaken as to whether the partnership existed between Daggett and others, as alleged, then on or about April 2, 1914, the defendant John P. Daggett appointed E. T. Stevens and C M. Coats his agents to look after, superintend, and to purchase supplies for the drilling of an oil well in Wichita county, Tex., upon lands held under lease by the said Stevens, Coats and others, and that afterwards between the dates before alleged Stevens and Coats, acting by virtue of their said agency and authority from the defendant Daggett, had purchased from the plaintiffs for the use of Daggett the goods, wares, and merchandise described in the exhibit above referred to, promising to pay therefor the prices stated which were usual and customary, and the prayer was for a recovery for the aggregate amount as against the defendant J. P. Daggett. The defendant Daggett answered under oath denying both agency and partnership. The case was submitted to a jury on special issues. The issues were thus submitted and answered by the jury in the affirmative, as indicated:

"Gentlemen of the Jury: This case is submitted to you upon special issues, and upon your finding the court will render such verdict as he thinks the law warrants.

"Special Issue No. 1. Find whether the defendant J. P. Daggett authorized E. T. Stevens to purchase materials necessary to the drilling of the second well, and to bind the said J. P. Daggett to pay for them. Answer yes or no. Answer: Yes.

"Special Issue No. 2. If you answer special issue No. 1 in the affirmative, then find whether the said E. T. Stevens, in purchasing the materials herein sued for, acted within the scope of the authority given him by said J. P. Daggett. Answer yes or no. Answer: Yes.

"Special Issue No. 3. Did the said J. P. Daggett knowingly permit the said E. T. Stevens to buy materials on the credit of the said J. P. Daggett for use in said well? Answer yes or no. Answer: Yes.

"Special Issue No. 4. If you answer special issue No. 3 in the affirmative, then find whether the said E. T. Stevens acted within the apparent scope of his authority in purchasing the materials herein sued for. Answer yes or no. Answer: Yes."

The defendant Daggett asked the submission of the following further issue, which

was given and also answered in the affirmative as indicated:

"You will say by your verdict whether or not Daggett was a partner in the Wichita River Oil Company. Answer yes or no. Answer: Yes.

"In connection with the above, you are charged that, before you can find Daggett a partner, you must believe from the evidence that there was an agreement by which Daggett was to share in the profits and losses which might accrue out of the drilling contract made by the Wichita River Oil Company with Hankins and others."

Upon the answers of the jury the court rendered judgment in favor of the plaintiffs against E. T. Stevens, J. F. Elliott, C. M. Coats, and J. P. Daggett for the amount sued for, and from this judgment the defendant Daggett alone has appealed.

[1] Appellant by appropriate assignments and propositions attacks the several findings of the jury as above given, but in substance but two questions are presented. They are, whether the evidence supports the jury's findings to the effect that appellant Daggett was a partner with others doing business under the name of Wichita River Oil Company, as alleged; or, if not, whether the evidence authorizes the findings to the effect that, in the purchase of the goods in controversy, E. T. Stevens was the authorized agent of the defendant Daggett. If the evidence supports either of these theories of the plaintiff's suit, the other facts without dispute are such as to support the judgment. We think it apparent that, if the jury's findings to the effect that E. T. Stevens in the purchase of the goods was acting with the actual or apparent authority given by J. P. Daggett has sufficient support in the evidence, then the issue of whether Daggett was a member of the partnership doing business in the name of Wichita River Oil Company is immaterial. At most, Daggett's liability as a partner, as sought to be established in the first count of the plaintiffs' petition, was on the theory that thereby he had impliedly authorized the acts of Stevens and other members of the partnership in furthering the partnership enterprise. We need not therefore scrutinize with great care the evidence tending to show that Daggett was a partner, as alleged, in view of the fact that a review of the evidence satisfies us that it is fully sufficient to support the plaintiffs' recovery on the theory of an express authorization or agency.

[2] In a general way, the evidence shows that the Wichita River Oil Company owned an oil and gas lease on a large body of land near Wichita Falls; that the company had sold to one Hankins and associates of Quanah, Tex., 100 acres out of said land, and had contracted with them to put down a well 1,000 feet deep on the 100 acres so sold. For this the oil company was to receive $2,-750, of which $2,500 was put up in a bank and trust company of Wichita Falls to be paid to the oil company when the well was drilled to the specified depth. The oil company, in order to carry out the drilling contract, had ordered drilling machinery which had been shipped to them at Wichita Falls, and for which it was necessary to pay before unloading; that, being without the means to do this, the oil company, acting through one or more of its partners, applied to J. P. Daggett for assistance. He finally agreed to, and did, furnish the necessary money by giving, with the oil company, a promissory note for $1,500 to one of the banks, in consideration of which the oil company transferred to Daggett a one-fifth interest in the oil lease remaining after the sale of the 100 acres, and to secure the payment of Daggett's obligation to the bank pledged the $2,550 which had been deposited as stated. It further appears that the oil company began the drilling of the well on the 100 acres sold to Hankins, and associates, and, after the well had been drilled to a depth of about 800 feet, it became so "jammed" or choked as that it had to be abandoned. Mr. Daggett was notified, and he came to Wichita Falls and contracted with one Copeland to drill another well in order to obtain the $2,500 originally deposited by Hankins and associates.

At this point we will quote some of the testimony. C. M. Coats, who was a member of the partnership composing the Wichita River Oil Company, testified, among other things, as follows:

"The Wichita River Oil Company did not make a contract with anybody to drill another well after the first well was drilled down to 800 feet and lost. They had nothing to do with the drilling of the other well, only to help manage the work. I undertook to do the work for the interest I had in it. O. F. Copeland drilled the first 500 feet of the second well. Mr. Daggett paid for it and furnished the money to buy the materials that were used by Copeland in drilling this well. * * * Mr. Daggett furnished all the money that was furnished for the drilling of the second well. * * * I had a conversation with Daggett. I was out trying to sell stock. He said, 'I am just sitting here shivering, listening any minute for Stevens to make a draft on me for a cable and wire to finish this well.' The Wichita River Oil Company did not finish the well. The company did not furnish any materials that were used in drilling the second well that I know. * * * Mr. Daggett said, 'I am just shivering, expecting a draft at any time to pay for this wire cable.' The old one was about worn out when they started the second well."

E. T. Stevens, another member of the firm, testified as follows:

"The first well was drilled between 700 and 800 feet; it was lost. That $1,500 was spent and a little more by the time that well was down 800 feet. Other arrangements were made after the first well was ruined with reference to drilling another well. We got a fellow to drill a well for $750. Mr. Coats telephoned Mr. Daggett to come up here. I met him at the Marion Hotel. I told him we had to do something toward drilling another well to save what money we had in it, to save that $2,500, and I told him we could get this fellow Copeland to dig it for $750, a thousand feet, and he signed a contract with him for $750. Mr. Daggett signed the contract. * * * The Wichita River Oil Company had not employed anybody to drill a

second well before Mr. Daggett got him. I superintended the drilling of the second well. Mr. Daggett gave me a check for $100 and told me to be as saving as I could. He said times were mighty hard, and he wanted me to run it as cheap as I could; and I did. I don't know whether Mr. Daggett put me in charge of it or not. I went in charge myself is how it was. I only talked with Mr. Daggett up to that time. I had never managed anything for the company. Mr. Daggett told me he wanted me to take charge of it. He told me if I would take it and run it he would put up the money to carry the thing through. He put up the money. I drew on Mr. Daggett for $250 when we got 500 feet. I also drew on him for numerous checks, for $1,100, somewhere along there. He paid every one of them. The $1,100 I drew on him for was all spent on the well for things to keep things going, implements, tools, and everything else that was needed toward drilling the well; $250 for labor, for fuel, hardware, and materials. He paid for them. I bought this stuff from the Avis Hardware Company. This hardware and material was used on the second well. * * * Mr. Daggett told me to draw on him for what I needed—when I needed any money, and be as saving as I could. He said I should go and buy the material, and I did as I was instructed as near as I could. I drilled the well down a thousand feet. Mr. Daggett drew the money from the bank, the $2,500. After that I did not drill any more. I did not do anything further after Mr. Daggett got the $2,500 from the bank. I did not consult Mr. Elliott, R. J. Dillard, or any of the other partners in the Wichita River Oil Company and call on them to put any money toward the drilling of the second well. When I went to get a new cable, or some fuel, to be used in the drilling of the second well, I did not take the matter up with the other partners. I drew on Mr. Daggett for the money. None of the materials which I bought through the Avis Hardware Company were to be furnished by Copeland. Mr. Daggett made the contract and signed the same with Copeland to do that drilling, and Copeland was to get his money from Mr. Daggett. Mr. Elliott, Mr. Coats, and Mr. Coats as manager of the company, had nothing to do with it—the actual signing of that contract. * * * There was no other contract between Daggett and myself other than the contract which he made with me to go ahead and be as sparing with money as I could because times were hard, and when any materials were needed to go and buy them and draw on him for the money. Mr. Daggett did not come to me and say, 'Listen, I am going to loan the company some money.' He said he was going ahead and complete the well. He said he was into it and would have to stay with us and furnish the money. He said it looked pretty hard, but he would have to do it."

F. P. Avis, one of the plaintiffs, testified: "I drew upon Mr. John Daggett for all of that bill of goods. He did not pay it. He paid part of it by draft. He paid $79.20. I drew on him at the request of Mr. Stevens. The draft was not paid the first time it was sent down there. I do not know of my own knowledge why it wasn't paid, or never learned from Mr. Daggett why it wasn't paid, or never learned from Mr. Daggett why it wasn't paid the first time it was sent. It was paid later, I presumed by Mr. Daggett; the draft was drawn on him. Later there was a conversation with Mr. Daggett over the phone with reference to it. He said over the telephone that it looked like the well was costing him a whole lot of money, and he expected to be in Wichita Falls in a day or two and would take it up with us."

Appellant, himself, testified, among other things, as follows:

"The first money I let them have I expected to get back out of the $3,500. When that money was used and the well was down to about 800 feet, they notified me that the well was spoiled, and I came up here. When I came up here, they had a man at the hotel, and they said he would drill a well a thousand feet deep. They had·not prepared any written contract when I got here; they had the agreement all made before I got here. Mr. Coats and Mr. Stevens had gotten him and had found out how much he would be willing to drill the well for, provided a responsible man would sign the contract with him. The other man signed it and I signed it. * * * I signed that contract for $750 in order to get that $2,500, or that $1,000 that was in the bank to the Wichita River Oil Company's credit. * * * The only way I had to get out of this proposition was to furnish the money for the last well, the $750, in order to get the $2,500. * * * I never authorized Mr. Stevens to buy anything except his tools and water. * * * I told him I would take care of his tools and oil. He drafted me for a cable. If he ever said anything about that, I don't know it, except when he drafted against me; he said the cable was broke and he would have to have a new cable. He bought it from the Avis Hardware Company and drafted against me for that and I paid it."

J. D. Avis, another one of the plaintiffs, testified:

"My name is J. D. Avis. I live in Wichita Falls. I have known Mr. Stevens, I suppose, as much as 25 years. I judge that I have known Mr. Coats about 2 years. I have known Mr. Daggett something like 20 or 25 years. At the time these materials were purchased through the Avis Hardware Company, I was actively connected with the Avis Hardware Company. The first knowledge that I had of this transaction was when Mr. Coats and Mr. Stevens came to the store and asked Piner, my son, to get these supplies for them. Piner refused to do so, and they waited until I came down to the store and told me that John Daggett was financing the proposition, and Mr. Coats and Mr. Stevens told me this when I came down to the store, and asked me if I would get these supplies for them, and I asked them who was to pay for them. They told me that John Daggett, at Ft. Worth. I said, 'Yes, I will get them for you.' I had known John Daggett for a good many years, and I told them that whatever supplies he would want, why he could get them. That was told me on two or three different occasions. I asked them those questions two or three times. At that time I didn't know where the well was. I knew it was somewhere up the river. They got these supplies that are stated in that account. I was to buy the goods at the wholesale prices. They said Mr. Daggett didn't want them to draw on him for this money now—or they didn't want to draw on him. They wanted to get as much time as they could. They wanted 60 days, and, to use their language, that 'John said that money matters were tight, and they would like to hold this off as long as they could.' I told them I was satisfied I could get it so as to give them 60 days, and as long as there was no profit in it to me they allowed me 10 per cent. for purchasing and handling the goods. I had to stand for the goods myself, that is, the Avis Hardware Company did, at the Continental Supply Company, and I think there was a small bill at the National Supply Company, a hundred dollars, or something like that, if I remember correctly. * * * I charged these goods on my books to the Wichita River Oil Company. I think I understood these gentlemen were the managers of the Wichita River Oil Company."

[3] The evidence quoted in our judgment sufficiently supports the findings of the jury in answer to special issues 1 to 4, inclusive. The mere fact that the goods on the books of the plaintiff company were charged to the

Wichita River Oil Company, instead of to John P. Daggett, does not overcome our conclusion. This fact was but a circumstance tending to show that credit was extended to the oil company, as appellant insists, rather than to J. P. Daggett. But this inference is explainable and overcome by the evidence tending to show that the plaintiffs inferred that Daggett was a member of the oil company partnership, and the further specific evidence to the effect that the plaintiffs refused to sell or procure the goods in question upon the credit of any other person than that of appellant, himself. The evidence authorizes the conclusion that appellant's relation to the drilling of the second well was something more than that of one who was merely loaning money to the Wichita River Oil Company for the purpose of completing the well. He alone entered into the contract with the driller; he alone purported to assume the responsibility of payment for the drilling; he alone made selection of Stevens to superintend the work; to appellant alone Stevens seemed to have reported and held himself responsible.

[4] Appellant insists that the authority extended to Stevens was to "draw" for such money as was needed. Thus far it does not appear that Stevens' authority is questioned, but if Stevens in the prosecution of the work undertaken, and in the effort to serve his master, Daggett, "because times were hard," secured the credit extended by the plaintiffs, Daggett cannot be heard to complain, even though Stevens in so doing may have exceeded the specific authority given him. It will hardly be necessary, we think, to cite numerous authorities in support of this proposition, but it may not be amiss to refer to at least one with some particularity. In the case of S. B. Burnett v. Nick Oechsner, No. 3096 (not for publication), in this court, it appears that one Williams was in charge of the appellant's ranch in Wichita county, Tex.; that the appellee Oechsner had some hogs that became troublesome; and that Williams a number of times penned the hogs, and as often notified appellee, but though appellee took them away he did not keep them up, as was the custom in the neighborhood, but permitted them to run at large. Burnett, upon being informed by Williams that the hogs were eating up the corn, instructed Williams to keep them out, but did not "give him any special instructions further than to keep them out." Later, upon another trespass on the part of the hogs, Williams caught them and hauled them from appellant's ranch in Wichita county, Tex., over into the Indian Territory, about 25 miles from Oechsner's residence, and unloaded them there at Burnett's hog ranch. In appellee's suit to recover the value of the hogs thus converted, we held, in an unpublished opinion, that Williams was acting within the scope of his authority, and in furtherance of Burnett's business, and that therefore Burnett was liable for Williams' acts. In case No. 7646 of Sam Hunt v. A. Cayton (not for publication), we made a similar ruling, as will be seen from the unpublished opinion in that case. See, also, Greer v. First Nat. Bank, 47 S. W. 1045; Reid Auto Co. v. Gorsczya, 144 S. W. 688; Mechem on Agency, § 740; Railway Co. v. Cooper, 88 Tex. 607, 32 S. W. 517.

The conclusions noted, we think, sufficiently dispose of all the assignments of error.

They are, accordingly, overruled, and the judgment is affirmed.